# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM LITTLE ANDERSON, | CASE NO. 1:09-cv-01547-LJO-GBC (PC) |
| Plaintiff, | FINDINGS AND RECOMMENDATIONS TO GRANT DEFENDANTS' MOTION FOR |
| v. | SUMMARY JUDGMENT AND TO DISMISS ACTION, WITH PREJUDICE |
| R. ROMAN MARIN, et al., | Doc. 33 |
| Defendants. | |
| _____ / | OBJECTIONS DUE WITHIN FIFTEEN DAYS |

## Findings and Recommendations

### I. Procedural Background and *Woods v. Carey*

On September 1, 2009, William Little Anderson ("Plaintiff"), a state prisoner proceeding pro se and in forma pauperis, filed a complaint pursuant to 42 U.S.C. § 1983. Doc. 1. On January 12, 2011, Plaintiff notified the Court of willingness to proceed on his cognizable claim against Defendants R. Roman Marin, K. Scott, D. Nelson, M. E. Spearman, and James Yates ("Defendants") for a violation of the Fourteenth Amendment Equal Protection Clause and to dismiss all other remaining claims and defendants. Docs. 10, 11.

On February 10, 2011, the Court issued a second informational order, advising Plaintiff that Defendant may file a motion for summary judgment and how Plaintiff must oppose the motion in order to avoid dismissal, pursuant to *Rand v. Rowland*, 154 F.3d 952 (9th Cir. 1998). Doc. 14. On May 25, 2012, Defendants filed a motion for summary judgment. Doc. 33.

On July 6, 2012, the Ninth Circuit found that the notice and warning of requirements for

1  opposing a defendant's motion for summary judgment should be issued contemporaneously when

2  a defendant files a motion for summary judgment, as opposed to a year or more in advance. *Woods*

3  *v. Carey*, 684 F.3d 934, 936 (9th Cir. 2012). On July 23, 2012, the Court issued an amended second

4  informational order to Plaintiff, in accordance with *Woods*. Doc. 37. On August 20, 2012, Plaintiff

5  filed an opposition to the motion for summary judgment, a memorandum in support of the

6  opposition, a statement of undisputed facts, and two declarations. Docs. 38-42.

## II. Legal Standard for Summary Judgment

8      Summary judgment is appropriate when it is demonstrated that there exists no genuine issue

9  as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R.

10  Civ. P. 56(a). Under summary judgment practice, the moving party:

11          [A]lways bears the initial responsibility of informing the district court
           of the basis for its motion, and identifying those portions of "the
12          pleadings, depositions, answers to interrogatories, and admissions on
           file, together with the affidavits, if any," which it believes
13          demonstrate the absence of a genuine issue of material fact.

14  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the

15  burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made

16  in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"

17  *Id.* If the moving party meets its initial responsibility, the burden then shifts to the opposing party

18  to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus.*

19  *Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In attempting to establish the existence of this

20  factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to

21  tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in

22  support of its contention that the dispute exists. Fed. R. Civ. P. 56(c); *Matsushita*, 475 U.S. at 586

23  n.11. In resolving the summary judgment motion, the Court examines the pleadings, depositions,

24  answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ.

25  P. 56(c). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

26  show that there is some metaphysical doubt as to the material facts. Where the record taken as a

27  whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine

28  issue for trial.'" *Matsushita*, 475 U.S. at 587.

### III. Plaintiff's Response to Motion for Summary Judgment

In Plaintiff's memorandum in support of his opposition to the motion for summary judgment, his statement of facts, and his declaration, he states that Defendants lack sufficient documentary evidence to support their assertion that fifteen (15) serious incidents involving African-American inmates, which transpired between October 2008 through January 2009, culminating in a riot. Pl. Mem. Opp'n at 11, Doc. 39; Pl. SF, Nos. 19-21, Doc. 40; Pl. Decl. ¶¶ 16, 22-23, Doc. 42.

In response to a motion for summary judgment, a plaintiff cannot simply restate his allegations from the complaint. *See Beard v. Banks*, 548 U.S. 521, 534 (2006) (citing Fed. R. Civ. P. 56(e)). Rule 56(e)(2) of the Federal Rules of Civil Procedure provides that "[w]hen a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must-by affidavits or as otherwise provided in this rule-set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party." Fed. R. Civ. P. 56(e). If the moving party's statement of facts are not controverted in this manner, a court may assume that the facts as claimed by the moving party are admitted to exist without controversy. *Beard*, 548 U.S. at 527. The Court "is not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (quoting *Forsberg v. Pac. Northwest Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir.1988)). Instead, the "party opposing summary judgment must direct the Court's attention to specific triable facts." *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003). Statements in a brief, unsupported by the record, cannot be used to create an issue of fact. *Barnes v. Independent Auto. Dealers*, 64 F.3d 1389, 1396 n.3 (9th Cir. 1995).

Plaintiff does not specifically refute the occurrence of the fifteen (15) incidents. Plaintiff only contends that Defendants lack sufficient documentary evidence. However, uncontroverted declarations are sufficient evidence to support a motion for summary judgment. Fed. R. Civ. P. 56(e). Thus, the Court will consider Defendants' declarations regarding the fifteen (15) serious incidents involving African-American inmates, which transpired between October 2008 through January 2009, culminating in a riot, as uncontroverted in the record.

**IV. Relevant Allegations in the Record for Fourteenth Amendment Equal Protection**

**A. The Parties' Statements of Facts and Declarations**

At the time relevant to this case, Plaintiff was an inmate in the custody of the California Department of Corrections and Rehabilitation ("CDCR") at Pleasant Valley State Prison in Coalinga, California ("PVSP"), housed in Facility "C" in Housing Unit #2. Pl. SF, Nos. 1, 2, Doc. 40; *see also* Pl. Decl. ¶ 2, Doc. 42. Defendants are Yates, Warden; Spearman, Associate Warden; R. Roman-Marin, Correctional Lieutenant; D. Nelso, Correctional Lieutenant; K. Scott, Sergeant, who were all employed at PVSP at the time relevant to this case. Pl. SF, Nos. 4-8, Doc. 40.

PVSP houses inmates at institutional security levels I, II, III, and IV. *See* Pl. SF, No. 3, Doc. 40; *see also* Pl. Decl. ¶ 3, Doc. 42. Level I, II, and non-close-custody level III inmates are housed in the gymnasium and level III and IV close-custody inmates are housed in cells. *See* Pl. SF, No. 3, Doc. 40; *see also* Pl. Decl. ¶ 5, Doc. 42. Based on Plaintiff's commitment offense and in-prison behavior, CDCR assessed his institutional security level at level III close-custody. *See* Pl. Decl. ¶¶ 3, 14, Doc. 42.

Between October 2008 and January 2009, there were approximately fifteen incidents of violence committed against African-American inmates in Facility C at PVSP. The victims of the violence included both African-American inmates affiliated with prison gangs and disruptive groups and non-affiliated African-American inmates. Several of the assaults were perpetrated with inmate-manufactured weapons. (Defs. Mot. Summ. J., Yates Decl. ¶ 33a; Spearman Decl. ¶ 2; Scott Decl. ¶ 2; Roman-Marin Decl. ¶ 2; Nelson Decl. ¶ 2, Ex. A, Doc. 33.)

Between October 2008 and January 2009, the assaults against African-American inmates became progressively more frequent and serious, culminating in a riot on January 8, 2009, between approximately fourteen inmates, including African-American inmates affiliated with the Crips disruptive group, African-American inmates affiliated with the Bay Area disruptive group, and non-affiliated African-American inmates. (Yates Decl. ¶ 33b; Spearman Decl. ¶ 3; Scott Decl. ¶ 3; Roman-Marin Decl. ¶ 3; Nelson Decl. ¶ 3, Ex. A.)

On December 4, 2008, an African-American inmate was discovered to have injuries consistent with being battered by an unidentified assailant. The unconscious inmate was discovered

with a laceration to the back of his head, a swollen upper lip, and a bruised lower back. While the inmate claimed that he fell from his bunk, his injuries were more consistent with a battery. (Yates Decl. ¶ 33c.)

On December 5, 2008, an African-American inmate became resistive during an escort and threatened to kill a correctional staff member. (Yates Decl. ¶ 33d.)

On December 16, 2008, two African-American inmates assaulted each other with inmate-manufactured weapons. Three inmate-manufactured weapons made out of steel and a broken cane were discovered in the vicinity of the assault (Yates Decl. ¶ 33e.)

On December 25, 2008, two African-American inmates assaulted each other. (Yates Decl. ¶ 33f.)

On December 26, 2008, an African-American inmate was assaulted by an unidentified inmate. The inmate was struck in the face from behind, rendering him temporarily unconscious, and he claimed the attacker was gone before he regained consciousness. (Yates Decl. ¶ 33g.)

On December 30, 2008, an African-American inmate was discovered to have injuries consistent with being the victim of being a battery by an unknown assailant. (Yates Decl. ¶ 33h.)

In November 2008 and December 2008, the assaults against African-American inmates described above were investigated to assess the cause(s) of the violence. During interviews with correctional staff, inmates advised staff that the violent incidents were a series of isolated occurrences. As the violence became progressively more frequent and serious, correctional staff became concerned that the inmates who chose to participate in the interviews were misleading staff so that normal programming would continue, thereby providing inmates with the access necessary to continue an organized campaign of violence or begin a series of retaliatory assaults. (Yates Decl. ¶ 33i.)

On January 8, 2009, at approximately 7 p.m., a riot erupted between African-Americans in the Facility "C" gymnasium among the level I, II, and non-close-custody level III inmates, involving eight Crips, three Bay Area, and three non-affiliated inmates. Pl. SF, No. 3, Doc. 40; Pl. Decl. ¶ 14, Doc. 42; (Yates Decl. ¶ 34; Nelson Decl. Ex. A, Doc. 33.) The total number of identified participants was determined to be 14. Pl. Decl. ¶ 14, Doc. 42. Two weapons were discovered, a broken walking

1    can and manufactured stabbing instrument. *Id.*

2        On January 8, 2009 at approximately 9 p.m., a Crip-affiliated inmate committed a battery on

3    a Bay Area-affiliated inmate. (Yates Decl. ¶ 35, Doc. 33.)

4        Based upon the totality of the information available on January 8, 2009, it appeared that an

5    unidentified group of inmates intended to commit violence against both African-American inmates

6    affiliated with prison disruptive groups and non-affiliated African-American inmates. Therefore, on

7    January 8, 2009, the African-American population of Facility C was placed on a modified program

8    to prevent any further assaults as prison officials investigated, assessed, and resolved the serious

9    threat to safety and institutional security. (Yates Decl. ¶ 36; Nelson Decl. Ex. A.)

10        On January 8, 2009, the investigation began immediately to assess the cause(s) of the

11    violence. During the modified program, inmates and facility staff were interviewed to gather

12    intelligence about the cause(s) of the violence. The yards, cells, common areas, and other areas of

13    the prison were searched thoroughly for evidence, inmate-manufactured weapons, and contraband.

14    Mail was screened for any information concerning planned violence. Each piece of evidence and

15    information obtained from either a search or interview was examined and all leads were followed.

16    (Yates Decl. ¶ 40; Spearman Decl. ¶ 5; Scott Decl. ¶ 5; Roman-Marin Decl. ¶ 5; Nelson Decl. ¶ 5.)

17        On January 16, 2009, Plaintiff filed an appeal, contending that his modified program status

18    was the product of discrimination and requested immediate termination. *See* Pl. Decl. ¶ 15, Doc. 42.

19        On February 1, 2009, Defendant Sergeant K. Scott (without being Warden Yates' designee)

20    denied Plaintiff's appeal at the informal level on the following basis: (1) Since October 2008,

21    Facility "C" has had over 15 incidents involving African-American inmates both affiliated and non-

22    affiliated; (2) incidents involving African-American inmates have been occurring more frequently

23    and becoming more serious in nature, culminating with a riot and additional battery in the gym; and

24    (3) the modified program will continue. Pl. Decl. ¶ 16.

25        On February 9, 2009, Defendant Warden Yates first believed PVSP could safely resume a

26    normal program in Facility C. Specifically, a through investigation indicated the violence between

27    November 2008 and January 2009 was not a coordinated campaign of violence. (Yates Decl. ¶ 42,

28    Doc. 33.)

1    After thirty-one (31) days, on February 9, 2009, PVSP resumed normal program for African-

2    American inmates housed in Facility "C." Pl. Decl. Attach. at 31, Doc. 42; (Yates Decl. ¶ 43, Doc.

3    33.)

4    On February 28, 2009, Defendants Lieutenant D. Nelson and  Associate Warden M. E.

5    Spearman (without being Warden Yates' designees) denied Plaintiff's appeal at the formal level on

6    the following basis: (1) African-American inmates do not divide themselves predicated on gang

7    affiliation, disruptive groups or geographical locations, which makes it difficult to determine the

8    extent of involvement. Pl. Decl. ¶ 17, Doc. 42.

9    On April 9, 2009, an unidentified source denied Plaintiff's appeal at the second level of

10   review and endorsed Warden Yates' name as being a designee thereof. Pl. Decl. ¶ 18. On July 14,

11   2009, Plaintiff's appeal was denied at the Director's level of review, based on the findings /

12   decisions of the previous lower level reviews, findings, and decisions. Pl. Decl. ¶ 19. On September

13   1, 2009, Plaintiff filed this civil action. *See* Pl. Decl. ¶ 20.

14   On June 2, 2010, PVSP Facility "C" classification committee recalculated Plaintiff's

15   institutional security level points to level II close-custody and transferred Plaintiff to Correctional

16   Training Facility in Soledad, California ("CTF-Central"). *See* Pl. Decl. ¶¶ 9, 10.

17   On June 18, 2012, due to being a victim of staff misconduct (excessive force), CTF-Central

18   endorsed Plaintiff as an override level II close-custody inmate and transferred him back to PVSP as

19   a level III inmate. Pl. Decl. ¶ 12.

20   The Defendants do not dispute that they treat African-American inmates different than

21   Hispanic / Latino inmates under similar sets of circumstances and facts. *See* Pl. Decl. ¶ 21. They

22   assert in their declarations / affidavits a projected reasoning for their distinct treatment which are as

23   follows: (1) Compared to Hispanic gangs / disruptive group inmates affiliation at PVSP, it is more

24   difficult for correctional staff to identify all gang or disruptive group activities or affiliated African-

25   American inmates population; (2) Unaffiliated African-American inmates are forced to engage in

26   disruptive group activities and Hispanic unaffiliated inmates are not; (3) Hispanic inmates, unlike

27   African-American inmates, do not work in concert together for a common purpose. *Id.*

28   The Defendants' affidavits / declarations claim, in summary, that: (1) They were advised

there were approximately 15 violent incidents committed against African-Americans; (2) The victims of the violence included both African-American inmates affiliated with prison gangs and disruptive groups and non-affiliated African-American inmates; (3) That they did not implement, adjust, or terminate Modified Program Number PVSP-FCP-09-01-008; (4) They did not have the authority to implement, adjust, or terminate Modified Program Number PVSP-FCP-09-01-008; (5) That only the Warden, or his or her designee(s), has / have the authority to modify or end a modified program; (6) With respect to Modified Program Number PVSP-FCP-09-01-008, they were no the Wardens' designee(s), and that to the best of their knowledge, Warden Yates did not have a designee, and thus, he maintained sole authority in the premise. Pl. Decl. ¶ 22.

## B. Background on Modified Programming

Plaintiff adopted Defendants' statement of facts as to the background on modified programming. Pl. SF, No. 9; *see* Defs. UF at 2-7, Doc. 33-2.

Normal programming at a prison means inmates attend work and education programs; have regular visiting, canteen, and telephone privileges; can attend the law library and religious services; and are released to the yard for recreation in large groups according to their yard schedule. (Defs. Mot. Summ. J., Yates Decl. ¶ 10, Doc. 33.)

CDCR policies and procedures direct that when a serious incident occurs, the priorities are to: (1) isolate, contain, and control the situation to the smallest possible area; (2) provide medical attention to all injured persons; (3) preserve all available evidence; (4) identify all involved persons; and (5) complete and submit appropriate written documentation and reports within the designated time frames. (Yates Decl. ¶ 11.) After the initial incident response is completed, the incident is assessed to determine whether it is necessary to modify or restrict programming activities for some or all inmates. If the incident is serious, it may be necessary to modify or restrict program activities for some or all inmates by: (1) declaring a State of Emergency; (2) locking down an entire facility or portions of a facility; or (3) placing some or all of the facility on a modified program. (Yates Decl. ¶ 13.)

A modified program typically involves the suspension of various programs and services for a specific group of inmates or a specific part of a facility. Modified programs are necessary when

1   correctional staff discover evidence or receive information that violence or disruptions are being

2   planned by some inmates against other inmates or staff, or that there exists a serious threat to

3   institutional security or the safety of inmates and staff. Work and education programs, visiting and

4   dayroom privileges, and outdoor yard time may be temporarily suspended; telephone, canteen, and

5   religious programming may be restricted. Essential services, including medical services, mental

6   health services, and hygiene, are maintained. The modified program plan is reviewed regularly and

7   revised as necessary. (Yates Decl. ¶ 12.)

8           When a group of inmates commit an assault, staff must determine whether the assault was

9   an isolated incident or the beginning of a coordinated campaign of violence involving many inmates.

10  (Yates Decl. ¶ 15.) All breaches of security, threats of violence, and disruptions are taken seriously,

11  but there is greater concern if there is evidence or information that an assault or threat to safety or

12  institutional security may be part of a greater scheme because it could lead to a larger-scale incident

13  or security breach, creating a more serious threat to the safety and security of the prison. Staff must

14  determine the likelihood that future violence will occur and the nature and causes of the violence.

15  (Yates Decl. ¶ 15.)

16          At all times relevant to this suit, striking the right balance between ensuring institutional

17  security and the safety of staff and inmates, and returning inmates to regular exercise and normal

18  programming as soon as it was safe to do so, was difficult. (Yates Decl. ¶ 23.) CDCR implements

19  lockdowns and modified programs when they are necessary to maintain safety and security in the

20  prisons, and to protect the lives of inmates and staff. Decisions to implement lockdowns or modified

21  programs are usually based on numerous situation-specific facts. Only by evaluating incidents on a

22  case-by-case basis can prison officials determine when a prison must be locked down or a group of

23  inmates placed on a modified program; when normal programs, including outdoor exercise, should

24  be suspended for particular inmates; or when and how normal programming can be safely resumed.

25  Decisions concerning the portion of the inmate population that should be subject to modified

26  programming are always situation-specific. The goal in making such decisions is to be neither

27  underinclusive nor overinclusive, and to impact the least number of inmates possible, while still

28  facilitating investigational tasks, and implementing measures best designed to ensure the safety and

1    security of the prison's staff, its inmates, and the institution as a whole. (Yates Decl. ¶ 17.)

2            Typically, after a precipitating incident, the lockdown committee meets, assesses the risk to

3    institutional safety and security, and determines what areas of the prison are affected, which

4    investigations must be conducted, whether to interview staff and inmates, and how to collect relevant

5    intelligence. The committee then submits a recommendation, which may include a request to

6    institute a modified program. The Warden, or his designee, approves or rejects the recommendation.

7    (Yates Decl. ¶ 18.) CDCR's policy is to return to normal programming as soon as it is safe to do so.

8    Gathering information about the cause(s) of violence, any significant security breaches that have

9    occurred, or the plans for committing acts of violence, is imperative so that prison staff can

10   determine how and when to resume normal programming and avoid further incidents. Once the

11   inmates who instigated the incident have been identified and removed from the general population

12   and correctional staff have determined it is safe to resume normal programming, a phased unlock

13   may begin. An unlock plan is developed to return to full programming. (Yates Decl. ¶ 19.)

14           Once a modified program is implemented, the process of investigating and gathering

15   intelligence begins. The investigation process can be slow, time-consuming, and labor intensive.

16   Inmates and facility staff and are interviewed to gather intelligence about the incident and to

17   determine whether it is safe to return to normal programming. Inmates often must be interviewed

18   more than once because they are reluctant to speak with or disclose information to correctional staff.

19   The yards, cells, common areas, and other areas of the prison are searched thoroughly for evidence,

20   weapons, and contraband. Mail is screened for any information concerning planned violence. Each

21   piece of evidence and information obtained from either a search or interview is examined and all

22   leads are followed, which often creates the need for additional searches and interviews. (Yates Decl.

23   ¶ 20.)

24           During a modified program, there are daily mandatory meetings with the Warden or designee,

25   Chief Deputy Warden, Facility Captain, Associate Warden, the Institutional Gang Investigation Unit,

26   and any line staff member with relevant information. The attendees discuss the progress of the

27   investigation, the status of the modified program, and the development of a plan to resume normal

28   programming. (Yates Decl. ¶ 21.) The risk associated with lifting modified programming

prematurely is that further incidents of violence can occur. For example, there have been instances at PVSP and other prisons where inmates and correctional staff members were injured as a result of prison officials being unable to fully identify all of the inmates involved in an incident due to obstacles that include inmates not cooperating in investigations, or inmates providing incomplete or inaccurate information. Yates was not willing to subject either inmates or correctional staff to unreasonable levels of danger in an effort to rush back to normal programming. (Yates Decl. ¶ 22.)

Among all of the programming activities that are suspended during a modified program, it is most difficult to determine when exercise programs can safely be resumed. Following a phased unlock, violence is most likely to occur on an exercise yard. Inmates have the greatest access to each other on the exercise yards, which is typically where most assaults occur. Self-imposed ethnic divisions are especially pronounced on the exercise yards because the various ethnic groups often claim areas of the yard as their turf. The number of inmates on a yard greatly outnumbers the correctional staff members assigned to monitor the area. (Yates Decl. ¶ 25.)

The discovery of inmate-manufactured weapons at the prison creates additional threats to institutional security that must be evaluated including, but not limited to, the type of weapon stock used, how they were manufactured, and their intended targets. (Yates Decl. ¶ 26.) Inmates associate along racial lines. Members of each racial or ethnic group tend to congregate and associate exclusively among those belonging to their own racial group. Levels IV and III general inmate populations are highly structured by prison and street gangs and an organized effort between races on these types of facilities is rare. Such organized efforts are often carried out by members of a single racial group working together. Further, it is not uncommon for inmates to hide or pass weapons, or attempt to carry out an assault, for another inmate of this same racial group. And inmates who are not affiliated with a gang often are pressured by gang members to assist them in violent activities. The threats are directed not only to the inmates, but also their non-incarcerated family and friends. (Yates Decl. ¶ 28.)

Non-race-based incidents between two inmates can lead to widespread race-based violence. For example, a fight between two inmates of different races that has nothing to do with race may be interpreted by other inmates as an act calling for retaliation against members of a participant's racial

group. (Yates Decl. ¶ 29.) Inmates planning violence often target and threaten inmates of their same race. For example, when inmates planning violence realize that facility searches are ongoing and that the weapons they have hidden will eventually be discovered and confiscated, they sometimes threaten violence against other inmates of their same race to coerce them to move or hide weapons to prevent them from being discovered, or to assault other inmates or staff. In such situations, if the pressured inmate does not comply, violent acts may be carried out against him. Consequently, it is sometimes necessary to lock down or place on modified program inmates who may not have directly participated in the triggering incident to protect them from members of their own race. (Yates Decl. ¶ 30.)

For the reasons outlined above, limiting the scope of a modified program to specific inmates known to be directly involved in an incident is often inadequate to ensure the safety of all inmates and staff. Modified programs imposed on a particular racial or ethnic group are sometimes necessary until prison officials can determine whether the incident has a racial component or will likely lead to broader racial or ethnic violence. (Yates Decl. ¶ 31.) It is more difficult, labor intensive, and expensive to operate a prison during a modified program. Typically, inmates are fed together in the dining halls, assist staff during work assignments, and can report to the showers and some medical appointments without an escort. During a modified program, correctional staff members must deliver all meals to each inmate's cell, most work assignments are suspended, and inmates must be escorted to showers and medical appointment. (Yates Decl. ¶ 27.)

## V. Legal Standard and Analysis for Plaintiff's Claim

### A. Fourteenth Amendment Equal Protection

#### 1. Legal Standard

The Equal Protection Clause . . . is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)); *Shakur v. Schriro*, 514 F.3d 878, 891 (9th Cir. 2008). An equal protection claim may be established by showing that the defendant intentionally discriminated against the plaintiff based on the plaintiff's membership in a protected class, *Serrano v. Francis*, 345 F.3d 1071, 1082 (9th Cir. 2003); *Lee v. City of Los Angeles*, 250 F.3d 668, 686 (9th

Cir. 2001), or that similarly situated individuals were intentionally treated differently without a rational relationship to a legitimate state purpose, *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *Engquist v. Oregon Department of Agriculture*, 553 U.S. 591, 601-02 (2008); *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 592 (9th Cir. 2008); *North Pacifica LLC v. City of Pacifica*, 526 F.3d 478, 486 (9th Cir. 2008). A plaintiff must allege sufficient facts either showing intentional unlawful discrimination or "that are at least susceptible of an inference of discriminatory intent." *Byrd v. Maricopa County Sheriff's Dep't*, 565 F.3d 1205, 1212 (9th Cir. 2009); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

Prisoners are protected from racial discrimination by the Equal Protection Clause, *Walker v. Gomez*, 370 F.3d 969, 973 (2004), and express racial classifications are immediately suspect, *Johnson v. California*, 543 U.S. 499, 509 (2005). Racial classifications are subject to strict scrutiny, and the government bears the burden of proving that the classification was narrowly tailored to serve a compelling government interest. *Johnson*, 543 U.S. at 505.

Racial discrimination in prisons and jails is unconstitutional under the Fourteenth Amendment, except for "the necessities of prison security and discipline." *Cruz v. Beto*, 405 U.S. 319, 321 (1972) (per curiam) (quoting *Lee v. Washington*, 390 U.S. 333, 334 (1968) (per curiam)). A strict-scrutiny standard applies to racial classifications in prisons, requiring that the government prove that such classification is narrowly tailored to further a compelling governmental interest. *Johnson*, 543 U.S. at 505-07. Under this standard, "the government has the burden of proving that racial classifications "are narrowly tailored measures that further compelling governmental interests." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995). In other words, Defendants must "show that reasonable men and women could not differ regarding the necessity of a racial classification in response to prison disturbances and that the racial classification was the least restrictive alternative (i.e., that any race-based policies are narrowly tailored to legitimate prison goals)." *Richardson v. Runnels*, 594 F.3d 666, 671 (9th Cir. 2010). No dispute exists that the state has a compelling interest in prison security, nor can there be such a dispute. *See Greene v. Solano County Jail*, 513 F.3d 982, 988 (9th Cir. 2008) (citing *Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005)). Indeed, "deference is due to institutional officials' expertise in this area." *Cutter*, 544 U.S.

at 725 n.13. The only issue that remains is whether the modified programs instituted here were narrowly tailored to further that interest. *Accord Warsoldier v. Woodford*, 418 F.3d 989, 998 (9th Cir.2005). *See Larry v. Tilton*, 2011 WL 4501396, at *15-16 (S.D. Cal. Mar. 3, 2011).

### 2. Analysis

Plaintiff has not established a genuine issue of material fact for trial as to his claim against Defendants for Fourteenth Amendment Equal Protection. Defendants' action in placing African-American inmates on modified lock-down status for thirty-one (31) days was narrowly tailored to meet strict scrutiny to ensure institutional security and the safety of staff and inmates.

The fact that strict scrutiny applies "says nothing about the ultimate validity of any particular law; that determination is the job of the court applying strict scrutiny." *Adarand Constructors, Inc.*, 515 U.S. at 229-30 . . . Prisons are dangerous places, and the special circumstances they present may justify racial classifications in some contexts. Such circumstances can be considered in applying strict scrutiny, which is designed to take relevant differences into account. *Johnson*, 543 U.S. at 515.

In *Richardson*, the inmate/plaintiff alleged that in several instances, assaults that were believed to be perpetrated by African American prisoners led to the lockdown of all African American inmates in a particular unit of the prison. 594 F.3d at 671. The Ninth Circuit held that under *Johnson*, defendants moving for summary judgment on a racial classification claim must show that "reasonable men and women could not differ regarding the necessity of a racial classification in response to prison disturbances and that the racial classification was the least restrictive alternative (i.e., that any race-based policies are narrowly tailored to legitimate prison goals);" and finding that defendants failed to carry this burden because they made no evidentiary showing at all concerning the basis for regarding all African American inmates as a security risk when <u>one or a few</u> African American inmates are responsible for an assault. *Id.* at 672. *See Armstead v. Virga*, No. 2:11-cv-1054 JAM-KJN, 2012 WL 2577562, (E.D. Cal. July 3, 2012) (emphasis added).

Modified programs that do not apply equally to all inmates <u>can survive strict scrutiny as a matter of law</u>. *Hurd v. Garcia*, 454 F. Supp. 2d 1032, 1052-53 (S.D. Cal. Sept. 28, 2006) (emphasis added) (finding the race-based security measure of keeping all inmates of one race on lockdown as being narrowly tailored and implemented to resolve the compelling government interest of restoring

prison security and discipline).

The facts of this case differ from prior cases involving isolated incidents of violence by a particular racial group. Between October 2008 and January 2009, there were approximately fifteen incidents of violence committed against African-American inmates in Facility C at PVSP. The victims of the violence included both African-American inmates affiliated with prison gangs and disruptive groups and non-affiliated African-American inmates. Several of the assaults were perpetrated with inmate-manufactured weapons. (Defs. Mot. Summ. J., Yates Decl. ¶ 33a; Spearman Decl. ¶ 2; Scott Decl. ¶ 2; Roman-Marin Decl. ¶ 2; Nelson Decl. ¶ 2, Ex. A, Doc. 33.) Between October 2008 and January 2009, the assaults against African-American inmates became progressively more frequent and serious, culminating in a riot on January 8, 2009, between approximately fourteen inmates, including African-American inmates affiliated with the Crips disruptive group, African-American inmates affiliated with the Bay Area disruptive group, and non-affiliated African-American inmates. (Yates Decl. ¶ 33b; Spearman Decl. ¶ 3; Scott Decl. ¶ 3; Roman-Marin Decl. ¶ 3; Nelson Decl. ¶ 3, Ex. A.)

The programming changes described by Defendants for the this lockdown amply demonstrate that the race-based security measures complained of by plaintiff were narrowly tailored and were implemented to resolve the compelling government interest of restoring prison security and discipline. *See Johnson*, 543 U.S. at 512, citing *Lee*, 390 U.S. at 334. *LaBranch v. Yates*, No. 1:09-cv-00048-AWI-JLT, 2012 WL 3838380, at *11 (E.D. Cal. Sept. 4, 2012). Defendants' actions of implementing a thirty-one (31) day lockdown following fifteen (15) violent incidents involving affiliated and un-affiliated African-Americans within the span of four months, culminating in a riot, were narrowly tailored to withstand strict scrutiny.

Plaintiff argues that Defendants are incorrect and Hispanic / Latino gangs do work together; and Plaintiff submitted a declaration by Latino inmate Mario Mancias in support of his claim. *See* Pl. Decl. ¶ 24, Doc. 42; *see also* Mancias Decl., Doc. 41. However, the exhibits attached to Mancias' declaration demonstrate that the Northern and Southern Hispanics or Fresno Bulldog gangs do not work together but regularly commit violence against one another. *See* Mancias Decl. Attach. at 5, Doc. 41 (On June 10, 2009, a riot erupted involving twenty-one Fresno Bulldog inmates and fourteen

Southern Hispanic inmates. Videotape evidence revealed the riot was initiated by Fresno Bulldog inmates); *see also* Mancias Decl. Attach. at 6 (On May 14, 2008, Southern Hispanics developed a calculated plan to attack the Fresno Bulldogs and that they will attack the Fresno Bulldogs on sight); Mancias Decl. Attach. at 8 (On November 3, 2008, a riot erupted involving ten Fresno Bulldog inmates and seven Southern Hispanic inmates. The Bulldog inmates initiated the riot by attacking the Southern Hispanic inmates with slashing type weapons); Mancias Decl. Attach. at 10 (On May 7, 2008, five Northern Hispanic inmates commenced to assault five Fresno Bulldog inmates).

Plaintiff contends that Defendants Lieutenant D. Nelso and Sergeant K. Scott are responsible for Plaintiff's status on a modified program. Plaintiff acknowledges that Defendants Nelson and Scott were only involved in the appeals process. Generally, denying a prisoner's administrative appeal does not cause or contribute to the underlying violation. *George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007). The mere possibility of misconduct is insufficient to support a claim, *Iqbal*, 556 U.S. at 678; *Moss v. U.S. Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009).

On February 1, 2009, Defendant Sergeant K. Scott (without being Warden Yates' designee) denied Plaintiff's appeal at the informal level on the following basis: (1) Since October 2008, Facility "C" has had over 15 incidents involving African-American inmates both affiliated and non-affiliated; (2) incidents involving African-American inmates have been occurring more frequently and becoming more serious in nature, culminating with a riot and additional battery in the gym; and (3) the modified program will continue. Pl. Decl. ¶ 16. After thirty-one (31) days, on February 9, 2009, PVSP resumed normal program for African-American inmates housed in Facility "C." Pl. Decl. Attach. at 31, Doc. 42. On February 28, 2009, Defendants Lieutenant D. Nelson and Associate Warden M. E. Spearman (without being Warden Yates' designees) denied Plaintiff's appeal at the formal level on the following basis: (1) African-American inmates do not divide themselves predicated on gang affiliation, disruptive groups or geographical locations, which makes it difficult to determine the extent of involvement. Pl. Decl. ¶ 17, Doc. 42. Thus, the undisputed facts demonstrate that Defendants Lieutenant D. Nelso and Sergeant K. Scott cited support in the record for their decisions and did not cause or contribute to the underlying violation. *George*, 507 F.3d at 609.

1    Plaintiff has not established a genuine issue of material fact for trial as to his claim against

2    Defendants for Fourteenth Amendment Equal Protection.

3                                  **3. Qualified Immunity**

4    Government officials enjoy qualified immunity from civil damages unless their conduct

5    violates "clearly established statutory or constitutional rights of which a reasonable person would

6    have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In ruling upon the issue of qualified

7    immunity, one inquiry is whether, taken in the light most favorable to the party asserting the injury,

8    the facts alleged show the defendant's conduct violated a constitutional right. *Saucier v. Katz*, 533

9    U.S. 194, 201 (2001), *overruled in part by Pearson v. Callahan*, 555 U.S. 223, 227 (2009) ("*Saucier*

10   procedure should not be regarded as an inflexible requirement").

11   The other inquiry is whether the right was clearly established. *Saucier*, 533 U.S. at 201. The

12   inquiry "must be undertaken in light of the specific context of the case, not as a broad general

13   proposition . . . ." *Id.* "[T]he right the official is alleged to have violated must have been 'clearly

14   established' in a more particularized, and hence more relevant, sense:  The contours of the right must

15   be sufficiently clear that a reasonable official would understand that what he is doing violates that

16   right." *Id.* at 202. In resolving these issues, the court must view the evidence in the light most

17   favorable to plaintiff and resolve all material factual disputes in favor of plaintiff. *Martinez v.*

18   *Stanford*, 323 F.3d 1178, 1184 (9th Cir. 2003). Qualified immunity protects "all but the plainly

19   incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

20   Since Defendants are entitled to summary judgment on Plaintiff's constitutional claims,

21   Defendants are also entitled to qualified immunity. Moreover, Defendants are entitled to qualified

22   immunity under the first prong because when considering the information available to Defendants

23   at the time of their decision, their conduct was reasonable and did not violate the constitution.

24   *Harlow*, 457 U.S. at 818. Thus, when Defendants were faced with fifteen (15) violent incidents

25   involving affiliated and un-affiliated African-Americans within the span of four months, culminating

26   in a riot, a reasonable person would have considered implementing a modified program in order to

27   protect the safety of the staff and inmates.

28   //

### VI. Conclusion and Recommendation

Plaintiff has "failed to point to 'specific facts' in the record that could 'lead a rational trier of fact to find' in his favor. *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e))." *Beard*, 548 U.S. at 535. Accordingly, pursuant to Rule 56 of the Federal Rules of Civil Procedure, it is HEREBY RECOMMENDED that the Court GRANT Defendants' motion for summary judgment, and that this action be DISMISSED, with prejudice.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within **fifteen (15) days** after being served with these Findings and Recommendations, the parties may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." A party may respond to another party's objections by filing a response within **fifteen (15) days** after being served with a copy of that party's objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153, 1156-57 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   December 21, 2012

UNITED STATES MAGISTRATE JUDGE